Jacquelyn A. COOTS, et al., Plaintiff(s)

v.

WACHOVIA SECURITIES, INC., et al. Defendant(s)

No. CIV.A. PJM 03–705.

United States District Court, D. Maryland.

Dec. 15, 2003.

Stephen B. Mercer, Molly Ann Kuehn, Sandler and Mercer PC, Rockville, MD, for Plaintiffs.

Virginia Wood Barnhart, John Preston Turner, Pope and Hughes PA, Towson, MD, for Defendants.

## OPINION

MESSITTE, District Judge.

### I.

Jacquelyn A. Coots, as Guardian of the Property of the minor children Tori Naomi Wallace, Noah Isadore Wallace, Halifath Wallace and Maya Patience Wallace, has sued Wachovia Securities, Inc., and Wachovia Bank, N.A. (collectively "Wachovia"), alleging that they converted life insurance proceeds disbursed to the children upon the death of their father. Wachovia seeks to compel arbitration of the dispute pursuant to a Customer Agreement that the children's mother, Cassandra Wallace ("Wallace"), signed with respect to the funds. The Court will **DENY** the Motion.[1]

### II.

Voga Eugene Wallace, the father of the minor children, carried a life insurance policy with Allstate Life Insurance Company, of which the children were designated as equal beneficiaries. When he died in the year 2000, the insurer sought to pay the policy proceeds of $301,572.08 to the children in four equal amounts. Accordingly, in approximately May 2000, it issued four checks payable to the children's mother, "Cassandra Wallace as Trustee FBO [for the benefit of] [each named child], a minor."

On or about June 14, 2000, Wallace took these checks to First Union National Bank and First Union Brokerage Services, Inc., Wachovia's predecessors in interest, where, instead of opening custodial accounts as trustee for the benefit of each child, she opened two accounts in her own name, "Cassandra Wallace." One of these was a bank account known as a "CAP" account (an apparent trademark of the Bank), and the second a brokerage account. As described in the Customer Agreement, this was an "integrated financial service," which included a checking account with the bank and a brokerage account with the brokerage company. The owner of the accounts could choose to pool the funds in the accounts with the available funds of other customers maintaining accounts with the bank and brokerage company and/or select sweep options comprised of either an interest-bearing deposit account in the bank or shares in an eligible Evergreen money market mutual fund.

---

1. Wachovia originally filed a Motion to Enforce Arbitration Agreement, Dismiss First Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings. The Court heard oral argument on the Motion and deferred ruling in order to permit limited discovery and briefing on the arbitration question. In the interim, Coots filed a Second Amended Complaint. Wachovia has now filed a Motion to Enforce Arbitration Agreement, Dismiss Second Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings. For the reasons stated in the text, Wachovia's Motion to Enforce Arbitration Agreement, Dismiss Second Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings (Paper No. 32) will be DENIED. Its Motion to Enforce Arbitration Agreement, Dismiss First Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings (Paper No. 14) is therefore MOOT.

The money market mutual fund was "neither insured nor guaranteed by the U.S. Government and there [could] be no assurance that the funds [would] be able to maintain a stable net asset value of $1.00 per share."

Nothing in the record suggests that either Cassandra Wallace or the Wachovia employee or employees involved in setting up the accounts in any way discussed the manner in which the checks that opened the accounts were made payable nor did they discuss the possibility that Wallace might open custodial, as opposed to personal, accounts. From all that appears, Wallace was authorized to deal with the accounts just as any individual, free of fiduciary obligations, might.

According to the Amended Complaint, by August 2001, the entire balance on the accounts had been dissipated.[2] Coots alleges that Wachovia converted the children's funds when it took from Wallace the checks naming them as beneficiaries and permitted her to open and use them in her personal accounts.

### III.

Wachovia seeks to compel arbitration of the claim based upon the Customer Agreement by which Wallace established the accounts, an Agreement which, by its terms, clearly subjects all disputes regarding the accounts to binding and mandatory arbitration and under which the parties waive their rights to seek remedies in court, including the right to a jury trial.[3] Wachovia seeks to bind the Wallace children to that Agreement despite their sta-

---

2. According to the Second Amended Complaint (para.9), the dissipation was "without benefit to the minor children." In her opposition to the Motion to Enforce the Arbitration Agreement, however, Coots concedes that Wallace may have applied at least some of the money to the payment of a mortgage on the family home, to the indirect benefit of the children.

3. The Agreement governing the CAP and brokerage accounts contains the following clauses:

III.... ARBITRATION OF DISPUTES REGARDING ACCOUNTS

If either you or we have any unresolvable dispute or claim concerning the deposit portion of your account, it will be decided by binding arbitration under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the U.S.Code. Arbitration hearings will be held in the city where the dispute occurred or where mutually agreed to. A single arbitrator will be appointed by the AAA and will be a retired judge or attorney with experience and knowledge in banking transactions. The arbitrator will award the filing and arbitrator fees to the prevailing party.

. . . . .

IV ... AGREEMENT TO ARBITRATE CONTROVERSIES

SET FORTH BELOW IS A PREDISPUTE ARBITRATION CLAUSE. IN CONNECTION WITH SUCH A CLAUSE, PLEASE NOTE THE FOLLOWING:
1. ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
2. THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO A JURY TRIAL.
3. PRE–ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
4. THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING, AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATIONS OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.
5. THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR AFFILIATED WITH THE SECURITIES INDUSTRY.
6. NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PREDISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTA-

tus as non-signatories, contending that their claim is "inextricably intertwined" or "inherently inseparable" from the Agreement, and because, in any case, the Wallace children have benefitted from the Agreement. Accordingly, says Wachovia, the children are equitably estopped from challenging the Agreement, including its terms requiring arbitration.

## IV.

 The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., establishes a strong federal policy favoring arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); see also, *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir.2001) ("The FAA mandates that if parties execute a valid agreement to arbitrate disputes, a federal court must compel arbitration.") (citations omitted). "In the Fourth Circuit, a litigant can compel arbitration under the FAA if he can demonstrate[:] (1) the existence of a dispute between the parties, (2) a written arbitration agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500–01 (4th Cir.2002). Despite federal policy favoring arbitration, "the initial inquiry is whether the parties agreed to arbitrate their dispute."[4] *Sydnor*, 252

TIVE CLASS ACTION, OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL: (I) THE CLASS CERTIFICATION IS DENIED; OR (II) THE CLASS IS DECERTIFIED; OR (III) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT, SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.
CUSTOMER AGREES, AND BY CARRYING A BROKERAGE ACCOUNT FOR CUSTOMER FUBS AGREES THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN FUBS AND CUSTOMER CONCERNING ANY TRANSACTION OR THE CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN U.S. PERTAINING TO SECURITIES, COMMODITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER SECTION IV OF THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF NORTH CAROLINA, BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR BEFORE AN ARBITRATION FACILITY PROVIDED BY ANY EXCHANGE OF WHICH FUBS IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS INC. OR THE MUNICIPAL SECURITIES RULEMAKING BOARD AND IN ACCORDANCE WITH THE RULES OBTAINING OF THE SELECTED ORGANIZATION. CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AN EXCHANGE OR SELF–REGULATORY ORGANIZATION OF WHICH FUBS IS A MEMBER, BUT IF CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO FUBS AT FUBS' MAIN OFFICE, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM FUBS TO MAKE SUCH ELECTION, THEN FUBS MAY MAKE SUCH ELECTION. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

4. Generally, state law determines questions concerning the validity, revocability or en-

F.3d at 305. A party cannot be required to submit to arbitration any dispute upon which he has not agreed to so submit. *Int'l Paper Co. v. Schwabedissen Maschinen & Angalen GMBH*, 206 F.3d 411, 416 (4th Cir.2000) (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

■ Common law principles establish that a non-signatory may sometimes be bound by an arbitration provision executed by other parties. *Id.* at 416–17. This results on the basis of one or more of five theories: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil piercing/ alter ego; and 5) equitable estoppel. *Thomson–CSF, S.A. v. Am. Arbitration Assoc.*, 64 F.3d 773, 776 (2d Cir.1995) (cited with approval in *Int'l Paper,* 206 F.3d at 417).

■ In the present case, Wachovia seeks enforcement of the arbitration provisions against the non-signatory children on the basis of only the last of these theories, equitable estoppel, the doctrine which precludes a party from asserting rights against another when his own conduct renders assertion of those rights contrary to equity. *Int'l Paper*, 206 F.3d at 417–18. Wachovia argues that the doctrine applies in two respects: first, because the Wallace children obtained a "direct benefit" from the accounts Cassandra Wallace opened, and, second, because their claims are "inextricably intertwined" with or "inherently inseparable" from with the contract containing the arbitration clauses.

■ As for the direct benefit theory, the Fourth Circuit has found the equitable estoppel doctrine an appropriate basis to compel arbitration against a non-signatory when that party "consistently maintained that other provisions of the same contract should be enforced to benefit him." *Id.* at 418. "A nonsignatory is estopped from refusing to comply with an arbitration clause when [he or she] receives a 'direct benefit' from a contract containing an arbitration clause." *Id.* (citations omitted); *see also, Mag Portfolio Consult, Gmbh v. Merlin Biomed Group Llc,* 268 F.3d 58, 61 (2d Cir.2001) (holding that where a non-signatory company knowingly exploits an agreement with arbitration clause, it can be estopped from avoiding arbitration). A "direct benefit" is deemed to be one contained within the provisions of the contract, which stands in contrast to an "indirect benefit" which flows as a result of the contract formation. *See, Thomson–CSF,* 64 F.3d at 779; *MAG Portfolio,* 268 F.3d at 61 ("The benefits must be direct—which is to say, flowing directly from the agreement."). Where a non-signatory benefits from the contractual relation of parties to an agreement but not the agreement itself, the non-signatory has not 'directly benefitted;' hence an arbitration clause will not have binding effect. *MAG Portfolio,* 268 F.3d at 61. Similarly, an abstract advantage gained from the contract, intangible or indefinite, will not compel a non-signatory to arbitrate. *Specht v. Netscape Comms. Corp.*, 306 F.3d 17, 39–40.

■ On the other hand, claims that are "inextricably intertwined" with or "inherently inseparable" from the contract containing an arbitration provision will also prevent a non-signatory from denying the arbitration provisions of the contract. Thus, in *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 321 (4th Cir.1988), the court held that an arbi-

forceability of contract. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 417 n. 4 (4th Cir.2000). However, because the Agreement at issue presents no question of contract formation or validity under state law, the "federal substantive law of arbitrability" will govern. *Id.*

tration agreement signed by a subsidiary corporation would bind its parent corporation for charges "based on the same facts and [ ] inherently inseparable," since to hold otherwise would effectively thwart the federal policy in favor of arbitration. In dicta, the court noted that the same result could be reached under a theory of equitable estoppel. *Id.* at 320–21. *See also, Int'l Paper*, 206 F.3d at 417 (noting the dicta of *J.J. Ryan*); *Sunkist Soft Drinks, Inc., v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993) (citing the Fourth Circuit's decision in *J.J. Ryan* while applying the same analysis to similar facts). However, outside the parent-subsidiary relationship, the Fourth Circuit has expressly declined to rule upon whether a non-signatory may be bound to arbitrate when claims are "inherently inseparable" from the remainder of the contract.[5] *Int'l Paper*, 206 F.3d at 418 n. 6.

## V.

■ The Court is persuaded by neither of Wachovia's equitable estoppel arguments. The benefits the Wallace children allegedly received—shelter, and perhaps even utilities, food, entertainment and the like—did not arise out of the Agreement that established the accounts. What the Agreement did was to create an arrangement whereby Cassandra Wallace was permitted to conduct her personal banking activities. It created accounts through which she could speculate with the funds or, as she might see fit, disburse them for her own benefit or that of her children. Clearly, however, the Agreement contained no provisions directly pertaining to the Wallace children; they are nowhere mentioned in the Agreement. To the extent that they may have obtained benefits from the relationship created by the Agreement, such as having funds from the accounts apply to the mortgage on the home where they lived, they were, at most, indirectly benefitted by the contract. *MAG Portfolio*, 268 F.3d at 61; *Specht*, 306 F.3d at 39–40. The children are not equitably estopped from resisting enforcement of the arbitration clause by reason of the "direct benefit" theory.

■ Nor are the children's claims bound to arbitration because they are "inextricably intertwined" with or "inherently inseparable" from the Agreement containing the arbitration provisions. As indicated, the Fourth Circuit has never extended this exception beyond the corporate parent-subsidiary setting. *J.J. Ryan*, 863 F.2d at 320–21. *See also, Int'l Paper*, 206 F.3d at 418 n. 6. But to the extent that Wachovia argues that a parent-child relationship equates to a corporate parent-subsidiary relationship—a debatable proposition—again this case is distinguishable because the interests of the parent and children here stand in marked opposition to each other; they are not, as in the corporate setting, derivative.

Finally, in a very practical sense, the children's claims cannot be considered "in-

---

5. Wachovia cites two cases in support of the proposition that arbitration clauses should bind non-signatory minors or family members. The first, *Trimper v. Terminix Int'l Co.*, 82 F.Supp.2d 1 (2000), held non-signatory children's claims bound to arbitration because they were "derivative of and closely related to" those of the signatory parent. The second case, *Kvaerner ASA v. Bank of Tokyo–Mitsubishi Ltd.*, 210 F.3d 262 (4th Cir.2000), involved guarantors of a construction agreement. The Court finds both cases inapposite.

Whereas in *Trimper* the children's claims were "derivative and closely related to" the parent's claim, here the children's claims are in sharp opposition to the parent's apparent use of the funds for her personal benefit. Further, the undertaking of the guarantors of the construction agreement in *Kvaerner*, in effect an assumption of the principal's obligations, sheds no light on cases such as this where the sharply opposing interests of a signatory parent and non-signatory children are involved.

extricably intertwined" or "inherently inseparable" from the Agreement. Their claim of conversion sounds in tort, not contract. They do not seek to enforce any provision of the contract. Wachovia's assertion of the contract by way of a defense cannot ipso facto create an "inherent inseparability" or "inextricable intertwining" of the claims and the contract. If this were allowed, the proponent of an arbitration clause would prevail every time simply by referring to the arbitration clause. The proposition falls of its own weight. *See, J.J. Ryan*, 863 F.2d at 320–21.[6]

### VI.

The Court **DENIES** Defendants' Motion to Enforce Arbitration Agreement, Dismiss Second Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings (Paper No. 32). Defendants' Motion to Enforce Arbitration Agreement, Dismiss First Amended Complaint, Strike Plaintiff's Jury Demand, or in the Alternative, to Stay Proceedings (Paper No. 14) is MOOT. Within 20 days from the date of this Order, Defendant shall file an answer to Plaintiffs' Second Amended Complaint. A Scheduling Order shall promptly issue.

A separate Order will be entered.

### *ORDER*

For the reasons stated in the foregoing Opinion, it is, this 15th day of December 2003, **ORDERED**:

1) Defendants' Motion to Enforce Arbitration Agreement, Dismiss Second Amended Complaint, Strike Plaintiffs' Jury Demand, or in the Alternative, to Stay Proceedings (Paper No. 32) is **DENIED**;

6. Coots also asserts that the arbitration provisions are unconscionably tilted in favor of Wachovia because, among other reasons, they deny the customer the right to a jury trial.

2) Defendants' Motion to Enforce Arbitration Agreement, Dismiss First Amended Complaint, Strike Plaintiffs' Jury Demand, or in the Alternative, Stay Proceedings (Paper No. 14) is **MOOT**;

3) Defendants shall answer the Second Amended Complaint within 20 days of the date of this Order;

4) A Scheduling Order shall promptly issue in this case.

Since the Court has denied Wachovia's motion on other grounds, it need not reach this argument.