12 A.3d 685

**Nancy Lee Kathryn THOMPSON, et al.**

v.

**Gordon WITHERSPOON, et al.**

No. 00012, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 1, 2011.

70

72

Kathleen H. Anderson & David F. Mister (Mister, Winter & Bartlett, LLC, on the brief), Timonium, MD, for appellant.

Timothy C. Bass, Washington D.C. & Mark Dumler, Baltimore, MD (David S. Panzer, Greenberg Traurig LLP, on the brief), Washington D.C., for appellee.

Panel: *DAVIS, KEHOE and FREDERICK J. SHARER (Retired, Specially Assigned), JJ.

KEHOE, J.

In *Case Handyman & Remodeling Servs., LLC v. Schuele,* 183 Md.App. 44, 62, 959 A.2d 833, *vacated on other grounds, Schuele v. Case Handyman & Remodeling Servs., LLC,* 412 Md. 555, 567, 989 A.2d 210 (2010),[1] we held that principles of estoppel permitted a *non-signatory* to a contract with a mandatory arbitration provision to enforce the arbitration clause against a *signatory* to the agreement "when the signatory's claims rely on the written agreement.[1]" *Id.* (footnote omitted). The appeal sub-judice presents the mirror image to *Case Handyman,* as we now consider the circumstances under which a *signatory* to a contract with an arbitration clause can enforce those provisions against a *non-signatory* to that agreement.

On August 29, 2008, Nancy Lee Kathryn Thompson, Barbara Thompson Clements and Karen Thompson Kirlin, on

---

* Arrie W. Davis, J., participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

1. Although this Court's decision in *Case Handyman* was vacated on procedural grounds, its reasoning on the merits of the issue may constitute persuasive authority in the same sense as other dicta may constitute persuasive authority on any legal issue. *See West v. State,* 369 Md. 150, 157, 797 A.2d 1278 (2002). Our reasoning on the merits in *Case Handyman* remains sound, as our analysis of some of the issues presented by the instant appeal will illustrate.

their own behalf and for the use of Susan Witherspoon, Carol Lareuse and the Estate of Albert E. Thompson, III, appellants, filed a complaint in the Circuit Court for Baltimore City against Manufacturer's Life Insurance Company ("Manulife"),[2] UBS Financial Services, Inc. and various affiliates ("UBS") and Gordon H. Witherspoon ("Witherspoon"), alleging negligent misrepresentation, deceit, conversion, negligence and breach of contract. UBS and Witherspoon each filed motions to stay the proceedings and the motions to compel arbitration. On February 2, 2009, the circuit court granted motions.

Appellants have appealed that order, presenting the following question, which we have reworded:

Did the circuit court err when it granted UBS's and Witherspoon's motions to compel arbitration? [3]

We answer the question in the affirmative and reverse the decision of the circuit court.

### FACTUAL AND PROCEDURAL BACKGROUND

There is no factual dispute between the parties as to whether appellants are required to submit their claims to arbitration. The following picture emerges from the allegations in the complaint.

On or about September 28, 1990, Nancy Lee Thompson and Albert E. Thompson, Jr. (the "Thompsons"), obtained a second-to-die life insurance policy from Manulife (the "policy"), insuring their lives for four million dollars ($4,000,000).[4] The

---

2. Manulife is now doing business as John Hancock Life Insurance Company USA. John Hancock is also a defendant. We will refer to these parties as "Manulife." Neither entity is a party to this appeal.

3. Appellants phrase the issue as:

Whether the Circuit Court for Baltimore City erred as a matter of law when it granted the motions of UBS and Witherspoon to compel arbitration, when there was no contractual relationship between the parties providing for arbitration?

4. A second-to-die life insurance policy insures the lives of two people, typically spouses. The death benefit is not paid to the beneficiaries until the death of the second insured.

Thompsons' children, Nancy Lee Kathryn Thompson, Barbara Ann Clements, Karen Thompson Kirlin, Susan Witherspoon, Carol Lareuse and Albert E. Thompson, III, were the named policy owners and beneficiaries.

Witherspoon, the Thompsons' son-in-law, was an employee of Paine Webber, Incorporated [5] and was an individual insurance producer, broker and agent for Manulife. Appellants contend that Witherspoon was the producer/broker of the policy and that he represented the Thompsons and appellants in its acquisition. Appellants, pursuant to the original policy application, authorized all correspondence regarding the policy to be sent to Witherspoon.

The policy required yearly premium payments in the amount of $105,000, which the Thompsons, at least initially, paid as gifts on behalf of appellants. However, the premiums were not paid from 1996 through 2003. Appellants allege that the Thompsons did not pay the policy premiums during those years "based on the continuing advice and/or action of Witherspoon." Appellants allege that "the gift monies [formerly] used to pay the premiums were diverted to pay other expenses, including private school education for Witherspoon's children." As a result, unbeknownst to appellants, Manulife borrowed against the value of the policy to pay the annual premiums plus accruing interest. Mr. Thompson died in 2005. Shortly thereafter, appellants became aware that approximately $900,000 had been borrowed against the policy to pay the premiums and interest.

On August 29, 2008, appellants filed a complaint against appellees, and Manulife, alleging negligent misrepresentation (Witherspoon), deceit (all parties), conversion (Witherspoon and Manulife), negligence (all parties) and breach of contract (Manulife). Appellants filed an amended complaint on Octo-

---

**5.** PaineWebber merged with UBS AG on November 3, 2000, at which point it began conducting business under the name UBS PaineWebber, Inc. In 2003, it was renamed UBS Financial Services, Inc. In this opinion, we will refer to Paine Webber/UBS PaineWebber, Inc./UBS Financial Services, Inc. as UBS.

ber 1, 2008. The amended complaint alleges that Witherspoon negligently misrepresented to appellants, the owners of the policy, that the insurance premiums were being paid, a material fact, when he knew that they were not being paid. The non-payment of the premiums led to Manulife's borrowing against the policy, which damaged appellants by decreasing the amount they will receive under the policy. Appellants assert that their reliance on Witherspoon's representations was reasonable in light of their familial and professional relationship with Witherspoon. Appellants also claim that Witherspoon's concealment of the fact that the premiums were not being paid amounted to deceit.

In regard to the conversion count, appellants contend that Witherspoon exercised absolute control over the policy and its cash value when he, "without the authority or permission of [appellants], intentionally initiated, facilitated, and/or applied for automatic premium loans or automatic dividend loans, against the available cash value and cash value of the paid-up dividends generated by the life insurance policy, without the consent of the policy owners." Appellants contend that Witherspoon's intentional actions interfered with their ability to manage and control their policy rights.

Appellants assert that Witherspoon owed a duty to them as the owners of the policy. They contend that he breached that duty by failing to notify them that the Thompsons were not paying the insurance premiums. Additionally, appellants contend that Witherspoon breached his duty to them "by initiating and facilitating policy loans without the knowledge and consent of the policy owners and/or by allowing the Thompsons, contrary to their right and authority, to initiate loans without the knowledge and consent of the policy owners."

The constructive fraud count again alleges that Witherspoon owed appellants a duty arising out of "their broker-client relationship, as well as personal familial relationship." They contend that Witherspoon breached this duty when he "misrepresented the consent of the policy owners to Manulife to institute the policy loans."

■ Appellants allege that UBS is liable to them for the negligent actions and deceit of Witherspoon through the theory of *respondeat superior.*[6] They also contend that UBS, as successor to PaineWebber, had a duty to them to "protect and preserve [their] interest in the policy and to act in a prudent and lawful manner." Appellants assert that UBS breached that duty by "allowing unauthorized loans to be taken against the policy."

On November 26, 2008, Witherspoon filed a motion to compel arbitration and to stay proceedings in the case pending completion of the arbitration process. UBS filed a similar motion shortly thereafter.

Appellees' contentions were premised on the fact that, in 2003, the Thompsons established accounts at UBS. At that time, UBS and each of the Thompsons, signed a Master Account Agreement and an InsightOne Brokerage Account Agreement (the "UBS Agreements"). The agreements contain clauses providing that

any and all controversies which may arise between UBS PaineWebber, any of UBS PaineWebber's employees or agents and Client concerning any account, transaction, dispute or the construction, performance or breach of this Agreement or any other agreement, whether entered into prior to, on or subsequent to the date hereof, shall be determined by arbitration.

Appellees argued that, because appellants were suing as owners and beneficiaries of the policy, a transaction accomplished through Witherspoon, appellants' claims must be decided by arbitration because the arbitration clause provision extends to disputes arising prior to the dates of the UBS Agreements. Finally, appellees contended that appellants

---

6. "[A]n employer's liability under *respondeat superior* is predicated on the rationale that the employer's control over the employee's work renders the employer constructively present during the work, 'so that the negligence of the servant is the negligence of the master.'" *Appiah v. Hall,* 416 Md. 533, 562, 7 A.3d 536 (2010) (quoting *Gallagher's Estate v. Battle,* 209 Md. 592, 601, 122 A.2d 93 (1956)).

were equitably estopped from claiming otherwise because they were seeking to benefit from a contract (the policy obtained through Witherspoon), while attempting to disavow the arbitration provision in the UBS Agreements.[7]

Appellants argued that they were neither parties to, nor bound by, the UBS Account Agreements. They asserted that the Thompsons were never the owners of the policy and that appellants' rights in the policy, thus, do not flow from their potential status as heirs, beneficiaries, successors or assigns. Appellants asserted that there is no contract between them and appellees and that the policy itself does not contain an arbitration clause. As such, appellants contended that they could not be compelled to arbitrate their claims.

The circuit court held a hearing on appellees' motions to compel on January 23, 2009. Following oral arguments by the parties, the circuit court granted appellees' motion, stating:

> [I]f there was no contract or no basis of an understanding that Mr. Witherspoon would serve as the financial advisor, then he would owe no duty to [appellants], and therefore no cause of action against him would exist in the absence of the contractual agreement between the [Thompsons] and Mr. Witherspoon.
>
> In short, I do find that [appellants'] causes of action are so intertwined with the contractual relationship by and between the Thompsons and UBS that the court must grant [appellees'] Motion to Compel Arbitration.

The circuit court also stayed all proceedings against the other defendants pending arbitration. Appellants filed a timely notice of appeal from the circuit court's decision.

---

7. Additionally, appellees stated that the Thompsons' accounts at UBS were collateralized, in part, by the value of the policy. In response, appellants asserted that the Thompsons had no authority to pledge the policy. The circuit court did not rely on the status of the policy as a grounds for its decision. Appellees do not present the argument on appeal.

DISCUSSION

## I. Appellate Jurisdiction

 A court's order granting an order to compel arbitration is an appealable final judgment because it has " 'the effect of putting the parties out of court. . . .' " *Rourke v. Amchem,* 153 Md.App. 91, 104, 835 A.2d 193 (2003) (quoting *Horsey v. Horsey,* 329 Md. 392, 401, 620 A.2d 305 (1993)). The posture of the case before us is complicated because there is another party, Manulife, who was not affected by the order compelling arbitration. Appellants' claims against Manulife have not been resolved by the circuit court. At first glance, then, the arbitration order is not a final, appealable judgment. *See* Maryland Rule 2–602(a) (an order that "adjudicates the rights and liabilities of fewer than all parties" is not a final judgment.)

In *Amchem,* the circuit court granted a motion requiring the plaintiffs to submit their claims against some, but not all, of the defendants to arbitration. The court stayed proceedings against the remaining defendant pending completion of the arbitration process. 153 Md.App. at 101–02, 835 A.2d 193. The circuit court did not certify the order compelling arbitration as an appealable final judgment pursuant to Maryland Rule 2–602(b). Writing for this Court, Judge Sally Adkins explained that, because an action to compel arbitration may be filed as a separate action against a party refusing to submit a dispute to arbitration, and does not relate to the underlying claim, an order compelling arbitration, even one directed at some but not all parties, is an appealable judgment "on the question of whether the issues raised in appellants' suit . . . were arbitrable." *Id.* at 107, 835 A.2d 193. In this regard, the case before us is factually and procedurally indistinguishable from *Amchem* and we reach the same conclusion.

## II. Standard of Review and Applicable Law

 As a general rule, a circuit court's decision whether a dispute is subject to arbitration is a matter of contract interpretation and is reviewed *de novo. Walther v. Sovereign*

*Bank,* 386 Md. 412, 422, 872 A.2d 735 (2005); *Case Handyman,* 183 Md.App. at 53, 959 A.2d 833. Absent a dispute of fact, we apply the same standard of review to cases, such as the one before us, that involve contentions that a party is estopped from denying that an agreement to arbitrate is applicable to them. *Id.* at 54, 959 A.2d 833.

We begin our analysis by determining the applicable law. There are two aspects to this threshold issue. The arbitration clauses in the UBS Agreements state that "[the] Agreement[s], [their] enforcement and the relationship between Client and UBS Financial Services shall be governed by the laws of the State of New York, including the arbitration provisions contained herein...." Neither party has presented an argument, to either the circuit court or to us, based upon New York law or asserted that the law of New York is different from Maryland's in any material respect. Therefore, to the extent that we apply state law, we will apply the law of Maryland. *Cf. Frericks v. GMC,* 274 Md. 288, 296–97, 336 A.2d 118 (1975) (appellate courts will generally not apply foreign law if a case was presented to trial court on the assumption that Maryland law was applicable).

▮ The second issue is whether state law, in the form of the Maryland Uniform Arbitration Act, Courts and Judicial Proceedings Article § 3–201 *et seq.* (the "MUAA"), or the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), applies. Both the Court of Appeals and this Court have noted that the MUAA and the FAA were adopted to achieve the same goals and both the MUAA and the FAA reflect legislative policies in favor of enforcing arbitration agreements. *See, e.g., Walther,* 386 Md. at 424, 872 A.2d 735; *Case Handyman,* 183 Md.App. at 56, 959 A.2d 833. As a result, when construing the MUAA, Maryland courts look to federal decisions interpreting the FAA. *Walther,* 386 Md. at 424, 872 A.2d 735; *Holmes v. Coverall North America, Inc.,* 336 Md. 534, 541, 649 A.2d 365 (1994).

▮ The FAA applies when the contract at issue affects interstate commerce. *Mattingly v. Hughes Elecs. Corp.,* 147

Md.App. 624, 632, 810 A.2d 498 (2002). While the issue was not raised before the circuit court, we note that the UBS Agreements certainly appear to affect interstate commerce as UBS conducts operations throughout the country. *See Walther*, 386 Md. at 423, 872 A.2d 735 (the FAA applies to "nearly all arbitration agreements....").

 Under the FAA, courts look to substantive provisions of state law regarding threshold issues of the validity, revocability, or enforceability of contracts, but to federal law to resolve issues as to whether a non-signatory to a contract can enforce, or be bound by, an arbitration provision in a contract signed by other parties. *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416–17 (4th Cir.2000) (citing, among other cases, *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) and *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988)); *Case Handyman*, 183 Md.App. at 56, 959 A.2d 833. In the case before us, there is no contention that the UBS Agreements are invalid; the issue is whether the arbitration provisions of those agreements can be enforced against appellants even though they are not signatories. Therefore, we look to the " 'body of federal substantive law of arbitrability.' " *Case Handyman*, 183 Md.App. at 56–57, 959 A.2d 833 (quoting *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24, 103 S.Ct. 927).

### III. Analysis

Appellants' position can be succinctly summarized: they are not parties to the UBS Agreements and the insurance policy (to which they are parties) does not contain an arbitration provision. Thus, they never consented to arbitration and the arbitration provisions in the UBS Agreements are not enforceable against them.

Appellees present a number of grounds in support of their position. Before turning to their principal contention, we will discuss their preliminary arguments.

(A)

Appellees first assert that the arbitration provisions in the UBS Agreements "encompass more than just disputes that are based on breaches of the [Agreements themselves]. Rather, the arbitration clauses apply to 'any and all controversies' with UBS and its employees that concern any: (i) account; (ii) transaction; (iii) dispute; or (iv) the performance or breach of services under the account agreements or any other agreement entered into between the parties[,]" whether such disputes arose prior to or after the execution of the UBS Agreements. Appellees frame the crux of appellants' claims against them as arising out of Witherspoon's "failure to give proper financial advice to the Thompsons" and assert that it is "almost inconceivable" that appellants could argue that a controversy arising out of that advice does not fall within the "incredibly broad spectrum of arbitral disputes" encompassed by the arbitration provisions of the UBS Agreements. The argument misses the mark.

The arbitration clauses in the UBS Agreements are indeed expansive. But the issue in this case is not whether otherwise enforceable arbitration clauses extend to the particular claims raised by appellants but rather whether the arbitration provisions of the UBS Agreements can be enforced against appellants at all.

Second, appellees state that

[e]ven if there were some ambiguity within the arbitration clauses, . . . this action must still be submitted to arbitration to determine whether the parties' dispute comes within the ambit of arbitral disputes. This is because all questions concerning the ambiguity of arbitration clauses must be resolved by the arbitrator.

The statement of the law is correct but inapplicable to the present case. Again, the question here is not whether the arbitration clauses in the UBS Agreements are ambiguous but whether the appellants have consented to, or are estopped from avoiding, the terms of those agreements. Whether or not a matter is to be compelled to arbitration is an

issue for the court, not the arbitrator. *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (" 'the *"question of arbitrability,"* is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." ' ") (quoting *AT & T Techs. Inc. v. Communic'ns Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)) (Emphasis added in *Howsam.*) Maryland law is to the same effect. *See Walther,* 386 Md. at 418 n. 2, 872 A.2d 735 (citing *Allstate v. Stinebaugh,* 374 Md. 631, 644, 824 A.2d 87 (2003)).

### (B)

We now turn to appellees' principal contention, namely, that appellants are equitably estopped from avoiding the arbitration requirement. In *Case Handyman,* Judge Graeff summarized the starting point of our analysis:

> Generally, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which [it] has not agreed to arbitrate. The obligation and entitlement to arbitrate, however, does not attach only to one who has personally signed the written arbitration provision, and [w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties. The principle underlying the theory of equitable estoppel rests on a simple proposition: it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage.

183 Md.App. at 57–58, 959 A.2d 833 (quotation marks and citations omitted).

Appellees present two arguments in support of their position. The first is that appellants' claims are so closely related to the contractual relationship between UBS and the Thompsons, that it would be unfair and unreasonable to permit them to avoid the effect of the arbitration clause. The second is

that appellants benefit from the UBS Agreements and are thus bound to the arbitration provisions.

To evaluate these contentions, we look to the well-established body of federal substantive law as to the circumstances under which arbitration agreements can be enforced against non-parties under the doctrine of equitable estoppel and similar legal principles. *Case Handyman,* 183 Md.App. at 57, 959 A.2d 833 (citing, among other cases, *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n,* 384 F.3d 157, 160 n. 1 (4th Cir.2004)); *Int'l Paper Co.,* 206 F.3d at 417 n. 4. These authorities instruct that there are

a number of theories under which nonsignatories may be bound to the arbitration agreements of others. Those theories arise out of common law principles of contract and agency law. Accordingly, we have recognized five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.

*Thomson–CSF v. Evans & Sutherland Computer Corp.,* 64 F.3d 773, 776 (2d Cir.1995); *see also Intl. Paper,* 206 F.3d at 417 (citing *Thomson* ). Appellees do not contend that any of these theories, other than estoppel, are applicable in this case.

Appellees assert that appellants' claims are so "intertwined with the contractual relationship between the Thompsons and UBS," that appellees are equitably estopped from rejecting the arbitration provision. The centerpiece of their argument is our analysis and one of our holdings in *Notre Dame v. Morabito,* 132 Md.App. 158, 182–83, 752 A.2d 265 (2000).

In that case, we considered whether a limitations provision contained in a contract between the owner of a building and an architect regarding renovations to the building was applicable to claims made by the owner against a structural engineer who provided services to the architect on the project. There was no contract between the owner and the engineer but the contract between the engineer and the architect contained an identical limitations provision. *Id.* at 162–64, 752 A.2d 265.

The owner argued that it was not a party to any contract with the engineer and the contractual limitation on the time for filing an action contained in its contract with the architect was inapplicable because the engineer was not party to that agreement. *Id.* at 165, 752 A.2d 265. Writing for this Court, Judge James Eyler explained why the owner's argument was unpersuasive:

[W]hile the [owner] ... included allegations in tort, its claims are ultimately dependent on and intertwined with [the engineer's] ... contractual duty to furnish engineering services. The contracts in this case were coordinated. The parties had consistent and complementary rights and responsibilities. The owner, in an action against the architect, would be bound by the accrual provision. As a claimant in the contractual chain, it should not be permitted to assert the lack of a direct written contract with a consultant to the architect to circumvent the enforcement of the accrual provision contained in the architect's contract with the owner and the consultant's contract with the architect.

*Id.* at 183, 752 A.2d 265.

*Notre Dame* did not involve an attempt to enforce an arbitration provision. In *Case Handyman*, we applied a similar analysis in such an action.

The Schueles entered into a home improvement contract with Professional Home Repair, Inc. ("PHR"), a franchisee of Case Handyman and Remodeling Services, LLC. PHR signed the contract as "Case Handyman Services." The contract indicated that PHR was independently owned and operated. 183 Md.App. at 49, 959 A.2d 833. The contract contained an arbitration provision. PHR defaulted on the contract and its principal filed for bankruptcy. The Schueles then filed suit against Case Handyman alleging breach of contract, violations of Maryland's Consumer Protection Act and negligence. *Id.* at 50, 959 A.2d 833. After examining the substance of the Schuele's allegations in their complaint, we concluded that, because their " 'entire case hinges on [their] asserted rights ... under the contract,' " the Schueles, as signatories to that

contract, were .estopped from avoiding the contract's arbitration provisions. *Id.* at 63–63, 959 A.2d 833 (quoting *Int. Paper Co.*, 206 F.3d at 418).

Our analyses in *Notre Dame* and *Case Handyman* have ample support in federal court decisions on this issue. *See, e.g. American Bankers Ins. Group v. Long*, 453 F.3d 623, 630 (4th Cir.2006); *McBro Planning & Dev. Co. v. Triangle Elec. Constr. Co.*, 741 F.2d 342 (11th Cir.1984); *Hughes Masonry Co. v. Greater Clark County School Bldg. Corp.*, 659 F.2d 836 (7th Cir.1981). However, there are two significant differences between those cases and the one before us.

First, *Notre Dame*, *Case Handyman*, and the other cases cited in the previous paragraph, involved situations where a non-signatory to an arbitration agreement attempted to enforce the arbitration provision against a signatory to that agreement. Our case presents the reverse. Second, unlike those cases, the claims asserted by appellants do not arise out of the provisions of the UBS Agreements. We will elaborate on each distinction and its significance.

(1)

UBS is a party to the UBS Agreements; appellants are not. In *Thomson–CSF*, the Court focused on the distinction:

the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.... [T]he nature of arbitration makes [the distinction] important. Arbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so. Thomson ... cannot be estopped from denying the existence of an arbitration clause to which it is a signatory because no such clause exists. At no point did Thomson indicate a willingness to arbitrate....

64 F.3d at 779 (emphasis in original; citation omitted).

The Court concluded that, because Thompson was a nonsignatory to the contract containing the arbitration provision,

it could be estopped from refusing to arbitrate its claim only if it had either directly benefitted from the agreement containing the arbitration clause or had attempted to enforce other provisions of the contract. *Id.* at 779. *See also Intl. Paper Co.,* 206 F.3d at 418 (A "nonsignatory is estopped from refusing to comply with an arbitration clause 'when it receives a "direct benefit" from a contract containing an arbitration clause.' ") (quoting *American Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349, 353 (2d Cir.1999)); *Deloitte Noraudit A/S v. Deloitte Haskins & Sells,* 9 F.3d 1060, 1064 (2d Cir.1993) (A nonsignatory is bound to arbitrate when it knew of the arbitration agreement and "knowingly accepted the benefits of" that agreement.).

 Appellees argue that appellants are estopped from avoiding the arbitration provision because Witherspoon

assisted in the purchase of a life insurance policy in his role as financial advisor to the Thompson's, and Appellants are the owners and beneficiaries of that policy. As owners and beneficiaries of the policy, Appellants also benefitted from the contractual relationship that existed between UBS and the Thompsons. . . .

 *Coots v. Wachovia Sec., Inc.,* 304 F.Supp.2d 694 (D.Md.2003), *vacated on other grounds, Coots v. Wachovia Sec.,* 114 Fed.Appx. 586 (4th Cir.2004), is instructive because it explains that the concept of "direct benefit" is limited:

A "direct benefit" is deemed to be one contained within the provisions of the contract, which stands in contrast to an "indirect benefit" which flows as a result of the contract formation. *See, Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2d Cir.1995); *MAG Portfolio Consult, GmbH [GMBH] v. Merlin Biomed Group, LLC,* 268 F.3d 58, 61 (2d Cir.2001) ("The benefits must be direct—which is to say, flowing directly from the agreement."). Where a non-signatory benefits from the contractual relation of parties to an agreement but not the agreement itself, the non-signatory has not 'directly benefitted;' hence an arbitration clause will not have binding

effect. *MAG Portfolio,* 268 F.3d at 61. Similarly, an abstract advantage gained from the contract, intangible or indefinite, will not compel a non-signatory to arbitrate. *Specht v. Netscape Comms. Corp.,* 306 F.3d 17, 39–40 (2d Cir.2002).

*Coots,* 304 F.Supp.2d at 699.

Appellants clearly have not derived a "direct benefit" from the UBS Agreements because those agreements do not provide that the insurance policy is to be issued to appellants and the policy itself was purchased years before the time that the Thompsons signed the UBS Agreements. The relationship between the insurance policy and the UBS Agreements is one of coincidence, not cause and effect.

Closely related to the notion that a party who receives a direct benefit from a contract is estopped from avoiding an arbitration provision in a contract is the rule that a creditor beneficiary to a contract who seeks to enforce it is bound by all of the contract's terms. In *District Moving & Storage Co., Inc. v. Gardiner & Gardiner, Inc.,* 63 Md.App. 96, 102, 492 A.2d 319 (1985), *aff'd, District Moving & Storage, Inc. v. Fedco Systems, Inc.,* 306 Md. 286, 287, 508 A.2d 487 (1986), we held that a third party beneficiary to a contract was bound by the contract's arbitration provision. While appellees cite *District Moving* to support their position, appellants are not third party beneficiaries of the UBS Agreements. "In determining whether a party is a third party beneficiary to a contract, the controlling issue is whether the contract's terms, in light of the surrounding circumstances, reveal an intent to make the promise to the third party in fact if not in form." *Notre Dame,* 132 Md.App. at 179, 752 A.2d 265 (citing *Flaherty v. Weinberg,* 303 Md. 116, 131, 492 A.2d 618 (1985) and *Spates v. Spates,* 267 Md. 72, 77, 296 A.2d 581 (1972)). Appellees do not point to any provision of the UBS Agreements that demonstrate such an intent and our review of the documents reveals none. To be sure, appellants, as putative heirs of the Thompsons, may potentially gain some benefit from the financial advice given by Witherspoon to their parents but such possibilities are too attenuated to be the basis for either concluding

that appellants are third party beneficiaries of the UBS Agreements or otherwise enforcing the arbitration provisions against appellants. *See MAG Portfolio*, 268 F.3d at 61 ("The benefits must be direct—which is to say, flowing directly from the agreement.")

### (2)

■■■ Appellees argue that, because appellants' claims are intertwined with the provisions of the UBS Agreements, they are estopped from avoiding the arbitration clauses in those contracts. Again, *Coots* is instructive because the Court considered a similar argument in a factual context analogous to the one before us.

*Coots* involved litigation between a guardian for two minor children and a bank. The guardian alleged that the bank had permitted the children's mother to abuse her status as trustee for the children's benefit by permitting the mother to withdraw money from accounts at the bank in violation of her fiduciary duties. 304 F.Supp.2d at 697. The account agreements between the mother and the bank provided for mandatory arbitration of disputes. The bank argued that the arbitration provision should apply because the children's claims were intertwined with the obligations of the bank under the agreement or, alternatively, that the children were beneficiaries of that agreement.

Judge Messitte rejected the bank's argument that the children's claims were inextricably intertwined with the account agreements between their mother and the bank:

> [I]n a very practical sense, the children's claims cannot be considered "inextricably intertwined" or "inherently inseparable" from the [account agreement]. Their claim of conversion sounds in tort, not contract. They do not seek to enforce any provision of the contract. Wachovia's assertion of the contract by way of the defense cannot ipso facto create an "inherent inseparability" or "inextricable intertwining" of the claims in the contract. If this were allowed, the proponent of an arbitration clause would prevail every

time simply by referring to the arbitration clause. The proposition falls of its own weight.

*Id.* at 700–01.

■■■ As in *Coots,* so too in the case before us. That appellants' claims against appellees sound in tort, not contract, is not dispositive. Instead, we look to the substance of the complaint. *American Bankers Ins. Group.,* 453 F.3d at 628; *R.J. Griffin & Co.,* 384 F.3d at 164. The substance of appellants' claims is that Witherspoon and UBS breached duties they owed to appellants in their capacity as owners and beneficiaries of the policy. While appellants assert that Witherspoon breached his duties to the Thompsons, this allegation is only part of their description of the factual background giving rise to their claims. There is nothing in the UBS Agreements that addresses Witherspoon's obligations to appellants.

Whether we articulate the test as requiring the claims to "rely on" the agreement with the arbitration provision, *Case Handyman,* 183 Md.App. at 62, 959 A.2d 833, or that the claims must be " 'inextricably intertwined' with, or 'inherently inseparable' " from, such an agreement, *Coots,* 304 F.Supp.2d at 701, the result is the same. There is an insufficient factual and legal connection between the claims asserted in the complaint and the terms of the UBS Agreements for appellees to invoke the arbitration provisions against appellants.[8]

---

8. Appellees also direct us to *Trimper v. Terminix Int'l Co.,* 82 F.Supp.2d 1 (N.D.N.Y.2000). The case involved a claim by family members for injuries arising out of an alleged misapplication of pesticides by an exterminator. One of the plaintiffs was a father, who had signed an agreement with Terminix that any subsequent dispute would be submitted to arbitration. The other plaintiffs (his children) did not sign the agreement but their claims were based on precisely the same facts and legal theories. The Court concluded that arbitration was appropriate because the children's claims were "derivative of and closely related to" their father's. *Id.* at 5. We are not confronted with a case where a plaintiff is asserting claims that are closely related to and derive from claims asserted by a co-plaintiff who is required to arbitrate. We leave for another day the decision whether non-signatories can be bound to an arbitration agreement under such circumstances.

Because we conclude that the circuit court erred in deciding that appellants were bound by the arbitration provisions of the UBS Agreements, we will reverse its order granting appellees' motions to compel arbitration.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS VACATED AND THIS CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.**

