REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 0352

September Term, 2013

_____

UBS FINANCIAL SERVICES, INC., ET AL

v.

NANCY LEE KATHRYN THOMPSON, ET AL

_____

Graeff,
Kehoe,
Hotten,

JJ.[1]

_____

Opinion by Hotten, J.

_____

Filed: June 25, 2014

[1] Judge Kevin F. Arthur did not participate in the Court's decision to designate this opinion for publication in the Maryland Appellate Reports pursuant to Maryland Rule 8-605.1

This case arises from a significant jury award for compensatory and punitive damages by a jury, sitting in the Circuit Court for Baltimore City, in favor of appellees, sisters Nancy Lee Katherine Thompson ("Kathy") and Barbara Clements ("Barbara")[1] against appellants, UBS Financial Services, Inc., UBS Financial Services Insurance Agency, Inc., UBS Insurance Agency, Inc., Paine Webber, Inc., and UBS Paine Webber, Inc. (collectively, "UBS") and Gordon Witherspoon ("Mr. Witherspoon"). Appellees alleged in their complaint that appellants' tortious conduct denied them the full value of a life insurance policy purchased by appellees' parents, Nancy ("Ms. Thompson") and Albert Thompson ("Mr. Thompson" and, together, "the parents"). Appellants filed various post-trial motions challenging the jury's award, all of which were denied by the circuit court.

---

[1] Kathy and Barbara's sister Karen Kirlin ("Karen") was originally a party to the suit but dismissed her claims against UBS and Mr. Witherspoon by stipulation entered on September 7, 2012.

UBS filed a timely appeal and presents four questions for our review,[3] while Mr. Witherspoon appealed and presented six.[4] We consolidate these questions into a single inquiry:

---

[3] UBS' original questions were:

1.   Did the [circuit] court err when it permitted [appellees] to recover the present value of unpaid premiums without subtracting the amounts that [appellees] would have had to pay in order to keep the policy in force?

2.   Did the [circuit] court err when it refused to strike claims against UBS for negligent supervision given that [appellees]: (a) did not have an "intimate nexus" relationship with UBS; (b) failed to prove that UBS breached its alleged duty to supervise; (c) failed to prove any damages; (d) failed to show that damages, if proved, were caused by UBS?

3.   Did the [circuit] court err when it refused to give the pattern jury instructions for insurance cases, which would have established UBS' duties?

4.   Did the [circuit] court err when it allowed [appellees] to introduce opinion evidence that there was a general lack of supervision at UBS because employees in other offices made risky stock investments for other clients?[]

[4] Mr. Witherspoon's original questions were:

1.   Did the circuit court err by denying defense motions to strike evidence, [sic] for judgement, and for JNOV, new trial, and/or remittiur pertaining to [appellees]' multiple windfall recoveries, speculative injuries, and excessive damages?

2.   Did the circuit court err by (a) ruling that the deceit, constructive fraud, and punitive damages claims and the finding of malice, were proven by clear and convincing evidence, and (b) excluding

4

Did appellees suffer legally recoverable injuries as a result of UBS' and/or Mr. Witherspoon's conduct?

For the following reasons, we determine that (1) appellees did not establish a sufficient claim for conversion; (2) appellees did not establish a sufficient claim for constructive fraud; (3) the circuit court erred by excluding appellants from introducing certain evidence regarding the parents' financial gifts to their children; (4) the circuit court erred by improperly instructing the jury on duty, and (5) the circuit court erred by entering a speculative and flawed jury award. We therefore reverse the judgments against appellants, and remand for a new trial on appellees' claims for negligence, negligent supervision, negligent misrepresentation, and deceit.

---

evidence of the parents' estate-planning intent to equalize their gifts and loans to their children?

3. Did [Mr.] Witherspoon have a duty to [appellees] to disclose the parents' decision to stop making gifts to [appellees] to fund the premium payments?

4. Did [Mr.] Witherspoon's failure to disclose the parents' decision to halt the gifts for the premium payments constitute conversion of the policy or its benefits?

5. Did the [appellees] have notice of the parents' decision, such that they were not justified in relying on [Mr.] Witherspoon's alleged non-disclosure or in delaying their lawsuit?

6. Were the punitive damages awards excessive or otherwise unwarranted?

5

**FACTUAL AND PROCEDURAL BACKGROUND**

This case stems from an insurance policy purchased by the parents on September 28, 1990. The policy was a "second to die" life insurance policy from The Manufacturers Life Insurance Company ("Manulife"). It listed "the owner" as the beneficiary and listed the children, Kathy, Karen, Susan Witherspoon ("Susan"), Carol Lareuse ("Carol"), and Barbara as the owners. The premium schedule indicated that premiums were "payable at annual intervals to second death, or to age 99 of the younger of the surviving lives, as follows[.]" Under a section marked "PAYMENT OF PREMIUMS[,]" the policy explained that:

> If a premium is not paid by the end of the grace period, your policy terminates, unless it has a value called a cash value. What happens then is explained in the "Automatic Premium Loan" and "Guaranteed Options" provisions. The "Surrender for Cash" provision describes the cash value.

The "GUARANTEED OPTIONS" section referenced above stated the following:

> If a premium is not paid and your policy has a cash value, you can chose a "guaranteed option" instead of resuming premium payments. The guaranteed options are (a) and (b) below.
>
>> If you do not choose a guaranteed option before the end of the grace period (or such other time as may be required by the law of the state in which this policy was delivered), and had not asked for the automatic premium loan option, we will apply option (a).
>
>> **(a) Paid-up life insurance.** You can continue the policy as paid-up life insurance payable on the second death. We will use the cash value, less any policy debt, as a net single premium on the due date to compute the amount of insurance.

6

**(b) Surrender for Cash.** You can surrender the policy for cash according to the "Surrender for Cash" provision.

The policy also contained a section entitled "AUTOMATIC PREMIUM LOAN" which stated the following:

We automatically will grant a loan to pay all or part of an unpaid premium if:

(a) the premium is still unpaid at the end of the grace period; and

(b) you asked for this loan option in the application, or we receive your signed request for it before the end of the grace period; and

(c) the loan value exceeds the policy debt.

We will loan the whole premium if at the end of the premium period the policy debt will not exceed the loan value. Where required by the law of the state in which this policy was delivered, we will advise you of the initial interest rate within the stipulated period of time.

If loaning the whole premium would make the policy debt at the end of the premium period greater than the loan value, we will loan only a part of the premium. The amount we loan will keep your policy in force from the due date of the premium until the policy debt equals the loan value. Then, if the balance of the premium is still unpaid, the policy will terminate.

You can write to us and cancel your request for the automatic premium loan. This cancellation will apply from the date when we receive your notice.

Other pertinent provisions of the policy read as follows:

CONTRACT

Your whole contract is in the policy and the application. A copy of the application is attached to the policy and deemed a part of it. We will not be bound by any statement that is not in the application or the policy. Only our President or one of our Vice-Presidents can amend or modify the policy, and only in writing.

7

Statements by you or either of the lives insured are representations, not warranties, unless fraud is involved. We will not use any statement by you or either of the lives insured to deny a claim, unless it is written in the application.

* * *

BASIS OF VALUES

The table of values on page 3 shows the basic values and the amount of paid-up whole life participating insurance. The basic value at any time is equal to the then present value of the paid-up insurance, and is calculated by the standard nonforfeiture method. The table assumes premiums are paid to the end of the policy year shown. It does not take into account any dividends, paid-up additions or policy debt.

The table shows values for a number of consecutive anniversaries. For each of the values shown and beyond the last of those anniversaries we compute all values and benefits by the standard nonforfeiture method.

All these values and benefits are at least as much as those required by the State in which this policy is delivered. We have filed a detailed statement of our method of computing them with your State's insurance department.

On your request we will state values and benefits for dates not shown. For a specific date in a policy year, we will allow for the time elapsed in that year and the date to which premiums have been paid.

Basic values and net single premiums are based on the Commissioners 1980 Standard Ordinary Smoker or Non-Smoker Mortality Table, without select factors. We assume interest at 6.25% per year in calculating basic values, paid-up values and paid-up additions; and that deaths occur at the end of the policy year of death.

The policy was signed by the parents, as well as Susan, Kathy, Karen, Carol, and Barbara. The parents, in order to avoid estate taxes, constructed a complex process involving cash gifts to the children/owners that would subsequently be used to pay the

8

premiums on the policy. This process was managed by Mr. Witherspoon, Susan's husband, an insurance broker and the parents' financial advisor. Mr. Witherspoon arranged for the premiums to be paid out of the childrens' bank accounts after a cash gift was deposited.[5] For many of the years that the premiums were not paid, Mr. Witherspoon arranged for the premium notices to be sent to an address "in care of" him. It was never envisioned that the children would pay the premiums with their own funds, and they never did.

The parents, through cash gifts to their children, paid premiums on the policy until 1996. However, the premium due that year was not paid, and payments were also neglected in 1998, 1999, 2000, 2001, 2002, and 2003. During these years, Manulife borrowed approximately $900,000 against the policy to cover the premiums. Appellees discovered that the policy had been devalued by these loans after Mr. Thompson's death in 2005. They, along with some of their fellow siblings, placed the blame on Mr. Witherspoon, UBS, and other financial companies associated with the policy.

Appellees filed their original complaint with a demand for a jury trial on August 29, 2008. Appellees filed an amended complaint on October 1, 2008, alleging counts of negligent misrepresentation (Count One), deceit (Count Two), conversion (Count Three), negligence (Count Four), and constructive fraud (Count Six) against Mr. Witherspoon and negligence pursuant to a theory of *respondeat superior* (Count Nine), negligence

---

[5] Kathy paid her share of the annual premium by check, as she did not have a bank account accessible by Mr. Witherspoon.

(Count Ten), and deceit (Count Thirteen) against UBS. The following chart illustrates the relationship between the relevant parties in the instant case:



UBS filed a petition to compel arbitration and motion to stay all proceedings on November 26, 2008, arguing that the insurance policy at issue was part of an agreement subjecting the case to arbitration. It subsequently filed an answer to appellees' amended complaint on December 15, 2008. The circuit court conducted a hearing regarding UBS' petition to compel arbitration on January 23, 2009. It entered an order granting appellants' motion and stayed the case that same day. Appellees appealed from that order to this Court. Appellants' arguments on that appeal were rooted in the fact that the

parents had signed a Master Account Agreement and an InsightOne Brokerage Account Agreement with UBS that contained arbitration clauses. Neither appellees nor their other siblings were parties to this agreement. Therefore, in *Thompson v. Witherspoon*, 197 Md. App. 69 (2011), we determined that the circuit court erred when it entered an order compelling arbitration. Following our vacating the circuit court's order compelling arbitration, appellees filed a motion to lift the stay of proceedings on May 27, 2011. The circuit court granted that motion on July 19, 2011.

Mr. Witherspoon thereafter filed an answer to the amended complaint on March 3, 2011. UBS re-filed their answer on March 10, 2011. Appellees subsequently dismissed all claims against Manulife, pursuant to a settlement, on June 6, 2012. Discovery commenced, and UBS filed a motion for complete summary judgment on September 11, 2012. Mr. Witherspoon also filed a motion for summary judgment on appellees' claims for negligent misrepresentation, deceit, conversion, negligence and constructive fraud on September 12, 2012. Appellees filed a motion for partial summary judgment on September 12, 2012. Following a hearing on October 15, 2012, those motions were denied.[6]

---

[6] UBS also filed a separate motion for partial summary judgment on claims that accrued prior to UBS succeeding Paine Webber in 1996. That motion was granted.

Following an eleven day jury trial, Mr. Witherspoon was found liable for negligence, negligent misrepresentation as to both Kathy and Barbara, but also found that he was not acting within the scope of his employment at UBS, thereby relieving UBS of liability under a *respondeat superior* theory. However, the jury concluded that UBS was negligent in its supervision of Mr. Witherspoon. The jury also determined, by clear and convincing evidence, that Mr. Witherspoon "concealed a material fact that he had a duty to disclose" to Kathy and Barbara and that he engaged in constructive fraud. They also found him liable for conversion and determined that he acted with "actual malice." The verdict sheet indicated the following concerning damages:

20. What do you find is the total reduction of value of the Policy?

Answer: $ 1,482,899

21. Of the amount set forth in your answer to 20, how much do you award to [Kathy]?

Answer: $741,449

22. By how much, if any, should [Kathy]'s award be increased to account for taxes?

Answer: $0

23. Of the amount set forth in your answer to 20, how much do you award to [Barbara]?

Answer: $741,449

24. By how much, if any, should [Barbara's] award be increased to account for taxes?

Answer: $0

Predicated on their finding that Mr. Witherspoon acted with actual malice, the jury also considered evidence on the issue of punitive damages. After testimony from Mr. Witherspoon, the jury awarded $150,000 in punitive damages.

Mr. Witherspoon moved for a judgment notwithstanding the verdict ["JNOV"], new trial or remittur, to alter or amend judgment, to reduce award of punitive damages or remittur or new trial on the punitive damages, and to stay enforcement of the judgment on December 6, 2012. UBS filed a motion for JNOV, new trial or remittur and to alter or amend the judgment on December 20, 2012. All post-trial motions were denied on April 23, 2013. Appellants thereafter noted a timely appeal.

Additional facts will be discussed as necessary to resolve the issues.

## DISCUSSION

## I.

### Conversion

We begin by examining appellees' claim for conversion against Mr. Witherspoon, since this tort is fundamentally different from appellees' remaining fraud and negligence claims. As these arguments were presented in motions for judgment pursuant to Md. Rule 2-519[7] and motions for JNOV pursuant to Md. Rule 2-532,[8] we review the circuit court's evaluation of these arguments *de novo. Mahler v. Johns Hopkins Hosp., Inc.*, 170 Md. App. 293, 317 (2006).

---

[7] Md. Rule 2-519 states, in relevant part:

"Conversion is an intentional tort that requires an exertion of ownership or dominion over another's personal property in denial of or inconsistent with the owner's right to that property." *Nickens v. Mount Vernon Realty Group, LLC*, 429 Md. 53, 77 (2012) (citing *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 261 (2004)). The element of ownership may be proved by evidence that the defendant "'initially acquir[ed] the property or . . . retain[ed] it longer than the rightful possessor permits.'" *Lasater v. Guttmann*, 194 Md. App. 431, 446-47 (2010) (quoting *Darcars*

---

(a) **Generally**. A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

[8] Md. Rule 2-532 reads, in pertinent part:

(a) **When permitted**. In a jury trial, a party may move for judgment notwithstanding the verdict only if that party made a motion for judgment at the close of all the evidence and only on the grounds advanced in support of the earlier motion.

(b) **Time for filing**. The motion shall be filed within ten days after entry of judgment on the verdict or, if no verdict is returned, within ten days after the discharge of the jury. If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for judgment notwithstanding the verdict if the verdict is against the moving party or if no verdict is returned. A motion for judgment notwithstanding the verdict filed after the announcement or signing by the trial court of a judgment or the return of a verdict but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

14

*Motors*, 379 Md. at 261-62). Although money is usually not subject to an action for conversion, "if the monies alleged to have been converted are 'specific segregated or identifiable funds[,]'" the action may lie. *Lasater*, 194 Md. App. at 447 (quoting *Allied Inv. Corp. v. Jasen*, 354 Md. 547, 564 (1999)). Similarly, the common law rule that only tangible property could be the subject of a conversion claim was modified to include certain intangible rights. *Jasen*, 354 Md. at 560. However, the Court of Appeals has limited claims for conversion under this theory to situations where "[the] tangible documents evidenced [the] property interests and . . . the documents were transferred improperly to" the defendant. *Id*. at 562. The *Jansen* Court specified the following:

> We agree that the tort of conversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document. We refuse, however, to extend the tort further, to cover completely intangible rights or as section 242(2) of the Restatement [(Second) of Torts (1965)] contemplates, to situations in which the relevant document itself has not been transferred.

*Id*. at 562. Section 242 of the Restatement (Second) of Torts (1965) states:

> § 242. Conversion of Documents and Intangible Rights

> (1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.

> (2) **One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted.**

(emphasis added).

During trial, evidence was introduced that Mr. Witherspoon arranged for policy premium notices to be sent to his address for several of the years that the premiums were not being paid. Appellees presented expert testimony that this deviated from the standard of care expected of an insurance agent. Accordingly, appellees argued throughout trial that their "ownership" was converted by Mr. Witherspoon through his handling of the premium notices and his concealment of the fact that loans were being taken out against the value of the policy.

In light of the holding in *Jasen*, we do not perceive how a jury could reasonably conclude that Mr. Witherspoon was liable for conversion. The *Jasen* Court explained that the tort of conversion extends to a wrongful exercise of control over "a document in which intangible rights are merged." 354 Md. at 562. An insurance policy falls into this category. However, the *Jasen* Court expressly declined to extend this line of reasoning to intangible rights "customarily" merged into a document when the document was not actually converted. Appellees' theory of conversion is, in substance, a rearticulation of the theory of liability espoused by the Second Restatement and rejected by the *Jasen* Court. By failing to forward the notices to appellees and their siblings, Mr. Witherspoon may have interfered with their rights as policy owners. However, he is not liable for conversion unless he exercised dominion over the policy itself, which appellees never alleged.

Appellees were "owners" of the insurance policy to the extent that they were nominally paying the premiums through cash gifts from the parents. However, this

ownership was in theory, not in reality. By appellees' own admission, the parents were actually in full control of the policy. It is not clear what "control" Mr. Witherspoon *could* take from the sisters. Beyond this limitation, appellees cannot claim that Mr. Witherspoon converted any specific funds, as there exists no agreed-upon, "identifiable" monies to be converted. Furthermore, there was no unauthorized transfer of a tangible document to allow conversion under this theory. Therefore, the circuit court erred by submitting the conversion claim to the jury.

## II.

### Constructive Fraud

Mr. Witherspoon argues that appellees' constructive fraud claim also fails, as Mr. Witherspoon did not share a "confidential relationship" with appellees. For the following reasons, we agree.

"Constructive fraud" is defined as a "breach of a legal or equitable duty which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." *Canaj, Inc. v. Baker and Division Phase III, LLC*, 391 Md. 374, 421-22 (2006) (quoting *Md. Envtl. Trust v. Gaynor*, 370 Md. 89, 98 (2002)) (some quotation marks omitted) (emphasis omitted). It is a tort that is often applied in tax and lending cases where a "confidential relationship" exists. *See Ellerin v. Fairfax Sav. F.S.B.*, 337 Md. 216 (1995); *Scheve v. McPherson*, 44 Md. App. 398 (1979). A confidential relationship is one in which "'two persons stand in such a relation to each other that one

17

must necessarily repose trust and confidence in the good faith and integrity of the other.'" *Upman v. Clarke*, 359 Md. 32, 42 (2000) (quoting *Green v. Michael*, 183 Md. 76, 84 (1944)). Some relationships, such as the one between an attorney and a client and a trustee and a beneficiary, are presumed to be confidential. *Id.* In other situations, a confidential relationship must be established by clear and convincing evidence. *Shih Ping Li v. Tzu Lee*, 210 Md. App. 73, 110 (2013), *aff'd*, 437 Md. 47 (2014). "'[T]he mere existence of a familial relationship is not indicative of a confidential relationship.'" *Latty v. St. Joseph's Soc. of Sacred Heart, Inc.*, 198 Md. App. 254, 266 (2011) (quoting *Orwick v. Moldawer*, 150 Md. App. 528, 538-39 (2003)).

Here, appellants did not establish a sufficient case for constructive fraud. As we will explain *infra*, Mr. Witherspoon initiated a duty towards appellees by taking it upon himself to receive the premium notices and coordinate payment of the premiums. However, this duty was limited in nature. Mr. Witherspoon was obligated to pay the premiums when he received the funds to do so and to notify appellees and their siblings when the premiums were unpaid. These duties are not fiduciary in nature, and we are not persuaded to expand the concept of fiduciary duty to provide appellees a remedy when a cause of action for negligence is available to them. Any fiduciary duty owed by Mr. Witherspoon was to the parents and their respective estates. *See Thompson*, 197 Md. App. at 88-89 (where we determined that appellees, "as putative heirs of the Thompsons, may potentially gain some benefit from the financial advice given by [Mr.] Witherspoon to their parents but such possibilities are too attenuated to be the basis for . . . concluding

that [appellees] are third party beneficiaries" of that relationship). Therefore, we determine that no reasonable jury could have found, by clear and convincing evidence, that Mr. Witherspoon committed constructive fraud.

### III.

### Evidentiary Issues

UBS and Mr. Witherspoon present separate evidentiary issues that they aver impacted the trial and prejudiced the jury. We will address both parties' contentions.

### A. Appellees' Cross-Examination of UBS' Expert

UBS avers that evidence elicited during the cross-examination of Mr. Witherspoon's expert witness John Duval ("Mr. Duval") that UBS generally did not supervise their brokers was a "prior bad act" in violation of Md. Rule 5-404(b). That rule is entitled "**Character evidence not admissible to prove conduct; exceptions, other crimes.**" and reads:

> (b) **Other crimes, wrongs, or acts**. Evidence of other crimes, wrongs, or acts including delinquent acts as defined by Code, Courts Article, § 3-8A-01 is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Unfortunately for UBS, it failed to cite Md. Rule 5-404(b) in objecting to the evidence, and is therefore precluded from arguing it here. *See Boyd v. State*, 399 Md. 457 (2007).

19

**B. Evidence on "Equalizing" Gifts**

Appellants also argue that they should have been allowed to present evidence that the parents sought to "equalize" gifts among the children. The circuit court issued a broad ruling excluding this evidence as irrelevant and unfairly prejudicial. For the following reasons, we determine that the circuit court erred in this pre-trial ruling and subsequent, related evidentiary rulings.

Md. Rule 5-401 outlines the standard for relevance at trial, and states:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"Generally, the [circuit] court has wide discretion when considering the relevancy of evidence." *In re Adriana T.*, 208 Md. App. 545, 568 (2012) (citing *State v. Simms*, 420 Md. 705, 724 (2011)). Md. Rule 5-403 guides the circuit court's discretion, reading:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The circuit court ruled, pre-trial, that evidence of "equalization" of gifts among the children would be excluded:

> I, frankly, with respect to testimony and the exhibits regarding equalization, don't see how there's relevance there. I don't agree with defense counsel that there's any relevance in that. And frankly, to the extent that there is some modest degree of value in giving some sort of framework or context as to what Mr. Witherspoon was doing, the [c]ourt finds that the probative value is substantially outweighed by the risk of prejudice.

> So the motion on that point with respect to evidence and testimony that there was an attempt for equalization, and what the parents wanted to be fair, and that Kathy Thompson was obsessed about it, and there were charts and figures and graphs, the [c]ourt's going to grant the motion to exclude that evidence based on the [appellees'] [m]otion in [l]imine.

During specific evidentiary arguments, the circuit court admitted some evidence of the parents' cash gifts to the children. However, it repeatedly indicated that it would not allow appellants to discuss "equalization." Significantly, the circuit court redacted a memo that UBS offered into evidence indicating that the father sought to "equalize" each child.

The crux of appellees' claims against Mr. Witherspoon is that his personal interest in securing money from the parents for his family prompted Mr. Witherspoon to act carelessly, or even intentionally, by exerting control over the premium notices. Thus, the evidence that the parents sought to provide the children with equal gifts was crucial for the defense. This intent to "equalize" tends to negate appellees' claims that Mr. Witherspoon and his wife were treated differently from the other children and their spouses, or that Mr. Witherspoon was exploiting his position as the parents' financial advisor. Furthermore, the chilling effect that the circuit court's pre-trial ruling had on appellants' ability to argue their defenses effectively cannot be overstated. Mr. Witherspoon, and by extension UBS, should have been able to place the parents' cash gifts to Mr. Witherspoon's wife in context. Preventing Mr. Witherspoon from presenting evidence that placed his relationship with the parents in context was severely prejudicial,

21

and the error permeated the circuit court's evidentiary rulings.  In our view, these rulings

significantly affected all aspects of the jury's verdicts regarding liability.

## IV.

### Jury Instructions and Duty

UBS argues that the circuit court abused its discretion in omitting its requested

jury instructions.  Many of these instructions related to the duty that Mr. Witherspoon, as

an insurance producer, owed appellees.  Both appellants argue that the circuit court erred

in holding that Mr. Witherspoon owed a broad, legal duty to appellees.  As both of these

issues concern the circuit court's handling of the concept of "duty," we believe that these

arguments are best addressed together.

UBS argues that the circuit court abused its discretion by failing to provide "basic"

jury instructions concerning insurance policies, specifically Maryland Civil Pattern Jury

Instructions ["MPJI-CV"] 14:1,[9] 14:2,[10] 14:4,[11] and 14:6.[12]  It also contends that the

---

[9] MPJI-CV 14:1 is entitled "INSURANCE – DEFINED" and states:

Insurance is an agreement whereby an insurance company, in exchange for a premium, agrees to pay a party, called the insured, or a party designated by the insured, an agreed amount [an amount up to an agreed limit] for a specific loss as a result of the happening of a specified event.

[10] MPJI-CV 14:2 is entitled "INSURANCE POLICY – DEFINED" and reads:

An insurance policy is the agreement or contract of insurance.  It contains the terms and conditions of the insurance and must include the identity of the person and/or property being insured, the risk or risks against which the person and/or property is being insured, the time the insurance begins and when it ends or how long it is to continue and the premium to be paid for

circuit court should have instructed the jury regarding the duty that insurance agents and

brokers owe to relevant parties, which is covered by the following instructions:

- MPJI-CV 14:5, "INSURANCE AGENT AND BROKER – DEFINED":

  An insurance agent is one who the insurance company authorizes to act for and bind it in matters relating to insurance. The agent's authority to act for the insurance company may be expressly given or may be implied from the insurance company's conduct.

  An insurance broker is one who obtains insurance for a person seeking insurance. A broker is considered to have been engaged by the person seeking insurance.

  An insurance broker is to be distinguished from an insurance agent since the broker does not act for and cannot bind the insurance company. However, in a transaction, a person may be an insurance broker for some purposes and an insurance agent for other purposes.

---

the insurance.

[11] MPJI-CV 14:4 is entitled "INSURANCE POLICY PREMIUM – DEFINED" and states that "[a]n insurance premium is the amount paid or agreed to be paid to the insurance company for the insurance."

[12] MPJI-CV 14:6 is entitled "INTERPRETATION OF INSURANCE POLICY" and reads:

An insurance policy is to be interpreted with the words and terms given their customary and usual meanings. When terms are ambiguous, you must consider the other evidence and testimony in this case concerning the intention of the parties. If the terms are still ambiguous, the language in the policy must be interpreted against the insurance company.

23

- MPJI-CV 14:7, "INSURANCE AGENT'S DUTY TO INSURED":

  Although an insurance agent acts on behalf of the insurance company and not the insured, the agent owes the insured a duty of reasonable care if the agent undertakes to act for the insured and the insured may rely on the agent to perform this duty.

- MPJI-CV 14:9, "INSURANCE BROKER'S DUTY TO INSURED":

  A broker owes the insured a duty to act with good faith, reasonable care, and skill. The insured may rely on the broker to perform this duty. The broker is responsible to the insured for any loss sustained by the insured as a result of the violation of this duty.

We review the circuit court's decision regarding which jury instructions to employ for abuse of discretion. *CSX Transp., Inc. v. Pitts*, 430 Md. 431, 458 (2013). "A party is entitled to an instruction that correctly states the law only if that law is applicable to some issue in the case, i.e., if there is testimony in the case which supports it[.]" *Wilbur v. Suter*, 126 Md. App. 518, 525 (1999) (citing *Kessler v. Equity Mgmt. Inc.*, 82 Md. App. 577, 593 (1990)).

We conclude that the circuit court did not abuse its discretion by declining to give the above referenced instructions, as we agree with appellees that these instructions were not correct statements of the law. While this State once distinguished between the terms "insurance agent" and "insurance broker," the General Assembly abolished that distinction in 2001. Now, Maryland, unlike many other states, does not distinguish between these terms. *Compare* Md. Code (1995, 2011 Rep. Vol.), § 1-101(u) of the

24

Insurance Article [hereinafter "Ins."] *with*, *e.g.*, *Essex Ins. Co. v. Zota*, 985 So.2d 1046, (Fla. 2008) ("It is important to note that 'insurance broker' and 'insurance agent' are not synonymous terms . . . . 'The distinction between an agent and a broker is important because acts of an agent are imputable to the insurer, and acts of a broker are imputable to the insured.'") (quoting 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 45:1 (3d. ed. 2007)) (emphasis omitted). Instead, Ins. § 1-101(u) reads:

> (u) *Insurance producer.* - (1) "Insurance producer" means a person that, for compensation, sells, solicits, or negotiates insurance contracts, including contracts for nonprofit health service plans, dental plan organizations, and health maintenance organizations, or the renewal or continuance of these insurance contracts for:
>
>     (i)    persons issuing the insurance contracts; or
>
> (ii)    insureds or prospective insureds other than the insurance producer.
>
> (2) "Insurance producer" does not include:
>
>     (i)    an individual who performs clerical or similar office duties while employed by an insurance producer or insurer, including a clerical employee, other than a clerical employee of an insurer, who takes insurance information or receives premiums in the insurance producer's office, if the employee's compensation does not vary with the number of applications or amount of premiums;
>
>     (ii)    a regular salaried officer or employee of an insurer who gives help to or for a licensed insurance producer, if the officer or employee is not paid a commission or other compensation that depends directly on the amount of business obtained; or
>
>     (iii)    if not paid a commission, a person that obtains and forwards information for:
>
>         1.    group insurance coverage;

2.      enrolling individuals under group insurance coverage;

3.      issuing certificates under group insurance coverage; or

4.      otherwise assisting in administering group plans.

For the reasons explained *infra*, we agree with appellants' general point that the circuit court erred by failing to guide the jury concerning Mr. Witherspoon's legal duty towards appellees.

The existence of a legal duty is an essential element of appellees' negligence claims. *See Barclay v. Briscoe*, 427 Md. 270, 292-93 (2012); *Lloyd v. General Motors Corp.*, 397 Md. 108, 136 (2007). Prevailing on a claim of negligence requires proof of a duty, a "breach of that duty, and [ ] injury proximately caused resulting from that breach." *Barclay*, 427 Md. at 292-93 (citing *Pendleton v. State*, 398 Md. 447, 458 (2007)). Negligent misrepresentation in particular requires the plaintiff to prove that "'(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.'" *Lloyd*, 397 Md. at 136 (quoting *Virginia Dare Stores v. Schuman*, 175 Md. 287, 291-92 (1938)). Appellees' remaining fraud claim against Mr. Witherspoon require that "(1) [that] the defendant owed a duty to the plaintiff to disclose

26

a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment." *Green v. H & R Block, Inc.*, 355 Md. 488, 525 (1999) (citing *Finch v. Hughes Aircraft Co.,* 57 Md. App. 190, 231-32 (1984)).

"Whether a legal duty exists between parties is a question of law to be decided by the court." *100 Investment Ltd. Partnership v. Columbia Town Center Title Co.*, 430 Md. 197, 211 (2013) (citing *Pace v. State*, 425 Md. 145, 154 (2012)). The concept of "duty" in Maryland is characterized as "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward one another.'" *100 Investment*, 430 Md. at 213 (quoting *Blondell v. Littlepage*, 413 Md. 96, 120 (2010)). "'Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.'" *100 Investment*, 430 Md. at 214 (quoting *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534 (1986)). Such an intimate nexus "may be established by contractual privity or its equivalent." *Select Exp., LLC v. American Trade Bindery, Inc.*, 178 Md. App. 607, 614 (2008) (citing *Jacques*, 307 Md. at 534-35).

In *100 Investment*, the Court of Appeals examined the concept of "intimate nexus" in a tort case involving a title search company. 430 Md. at 203. The plaintiff, 100 Investment Limited Partnership ("the Partnership"), employed two title companies to search titles for certain land in Howard County. *Id*. at 202. The title companies failed to

uncover a previous conveyence of the land in question. *Id.* The Partnership subsequently sued the title companies for negligence, claiming solely economic damages. *Id*. at 206-07. In discussing whether the title search companies were liable for those damages, the Court outlined case law discussing the rationale behind the "intimate nexus" rule:

> We explained in [*Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645 (2000)] that "the rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct . . . resulting in economic damages . . . [is] to avoid 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'" A defendant can protect itself from such unpredictable and unlimited liability in cases where there is a close nexus between the parties. Such a relationship might stem from a defendant's knowledge of the plaintiff's identity, the class in which a plaintiff belongs, and the defendant's knowledge that the prospective plaintiff may be relying on the information provided by a defendant.

*Id*. at 218 (modifications in original) (some citations omitted). The Court subsequently concluded that the title search companies were in an "intimate nexus" with the Partnership, as they knew that the Partnership would be relying on the title search to purchase the land in question.

Compare that case with *Noble v. Bruce*, 349 Md. 730 (1998). *Noble* examined the analogous concept of "strict privity" between attorneys and clients, and involved two sets of beneficiaries who sued the attorneys who prepared the will that the beneficiaries were expected to take from. *Id*. at 734, 737. In the first case, the suit alleged that Charles A. Bruce, Jr. ("Attorney Bruce") committed legal malpractice by failing to advise the testators (who were also the beneficiaries' parents) of certain tax-avoidance tactics that could have benefitted the estate. *Id*. at 734. In the second, the beneficiaries averred that

28

T. Hughlett Henry, Jr. ("Attorney Henry") prepared the tax structure of the will contrary to the testator's intent. *Id.* at 737. Attorney Bruce prevailed on summary judgment, while the circuit court granted Attorney Henry's motion to dismiss. *Id.* at 730. The Court of Appeals granted *certiorari* in each case. *Id.* at 735, 737.

The Court determined that the "strict privity" rule, which states that "a third party not in privity with an attorney has no cause of action against the attorney for negligence in the absence of fraud or collusion[,]" *Id.* at 738 (citing *Nat'l Savings Bank v. Ward*, 100 U.S. 195, 205-06 (1879)), applied in both cases. 349 Md. at 752. Thus, the Court concluded that the non-client beneficiaries could not pursue a malpractice suit against the attorneys in question. *Id.* at 752-53. In making this determination, the Court rejected the beneficiaries' arguments that they were "third party beneficiaries" under an exception to the strict privity rule:

> As we stated earlier, [under the third party exception to the strict privity rule,] the client's intent to benefit the nonclient must be a direct purpose of the transaction or relationship in order for the nonclient to be considered a third-party beneficiary. In cases involving wills, the beneficiary of a will is not necessarily the beneficiary of the attorney-client relationship . . . .
>
> * * *
>
> As the Supreme Court of Virginia noted, "[t]here is a critical difference between being the intended beneficiary of an estate and being the intended beneficiary of a contract between a lawyer and his client . . . . A promise to prepare a will pursuant to the instructions of a testatrix states a direct obligation to render a performance beneficial to her, i.e., the creation of a document which would enable her upon her death to effect the transfer of her assets to the beneficiaries named in her instructions."

29

*Id*. at 753-54 (modification in original) (some internal citations and quotation marks omitted).

As the extent of UBS' liability is predicated on its supervision of Mr. Witherspoon, we will first address the issue of Mr. Witherspoon's duty to appellees. This is a complex question, in part because Mr. Witherspoon was a party to the insurance contract. We first note that appellees did not present a nexus between the alleged duty and the alleged breach. Mr. Witherspoon certainly owed a duty to appellees *under the insurance contract*. However, appellees did not allege a breach of that contract. Rather, their causes of action related to Mr. Witherspoon's actions as a financial advisor. Mr. Witherspoon never contracted with appellees to act in that manner. To the contrary, record evidence indicates that the expectation of all relevant parties was that the parents would manage the policy and that appellees "paid" the premiums only as a fiction, since in reality, the parents either paid the premiums directly, or provided cash gifts to the children to pay the premiums. During oral argument, counsel for appellee even stated that the parents' never expected appellees to truly pay the premiums themselves. This is bolstered by the fact that appellees never presented evidence at trial indicating that they were in a position to pay the premiums. Thus, at the inception of the contract, Mr. Witherspoon was clearly under no duty to remind appellees to pay the premiums.

Our conclusion is supported by a survey of law from sister states. Even in states where there is a distinction between an "insurance broker" and an "insurance agent," the focus is on the agent or broker's duty while obtaining the insurance, not after. *See*, *e.g.*,

*Mark Tanner Constr., Inc. v. HUB Int'l Ins. Services, Inc.*, 224 Cal. App. 4th 574, 584 (2014) ("'Insurance brokers owe a limited duty to their clients, which is only to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured.'") (citations omitted in original); *Indiana Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 999 N.E.2d 922, 933 (Ind. 2013) ("An insurance agent or broker who undertakes to procure insurance for another is an agent of the proposed insured, and owes the principal a duty to exercise reasonable care, skill, and good faith diligence in obtaining the insurance[ ]").

Importantly, many other jurisdictions emphasize that the onus for paying the premiums is on the insured, not the insurer or its agents. *See, e.g., Webb v. American Employers Group*, 268 Neb. 473, 483 (2004) ("[T]he burden is on an insured to keep a policy in force by the payment of premiums and is not on the insurer to exert every effort to prevent the insured from allowing a policy to lapse through failure to make premium payments."); *Walker v. Federal Kemper Life Assur. Co.*, 828 S.W.2d 442, 449 (Tex. App. 1992) ("The payment of the premium in accordance with the provisions of an insurance policy is a condition precedent to the establishment of liability of the insurer."); *Parlier Fruit Co. v. Fireman's Fund Ins. Co.*, 151 Cal. App.2d 6, 22 (1957) ("There is implied an agreement to pay the usual premium."); *but see Paul v. Columbian Nat. Life Ins. Co.*, 125 N.J. L. 350, 356 (1940) ("A premium is not an obligation of the policy holder"). Although states differ on what the consequences of failing to pay a premium are, our

31

survey indicated that in all cases, the insured and the policy holders have a sense of agency in the decision of whether to pay the premiums.

We determine that a similar rule applies in this case as well. Appellees presented no evidence to indicate that either Mr. Witherspoon or UBS had a duty to inform appellees that the premiums were not being paid. On the contrary, the circumstances indicate that the ultimate responsibility to pay the premiums on the life insurance policy rested on the parents and appellees, as owners of the policy.

Appellees' theories of recovery are ultimately contradictory. They attest that they, as policy owners, were owed a duty by Mr. Witherspoon. However, they sought damages as beneficiaries of the policy who had not received its full value. Analogizing the "strict privity" rule explored in *Noble* is useful here. Although *Noble* involved attorney malpractice suits stemming from will drafting, we observe significant parallels to the instant case in its reasoning. While not a formal will, the parents' life insurance claim was essentially a vehicle for dividing their considerable estate amongst their children. Mr. Witherspoon was in a similar position as an attorney drafting a will. A similar duty rule therefore applies here when analyzing appellees' roles as beneficiaries, and we determine that Mr. Witherspoon was under no duty to ensure that appellees, *as beneficiaries*, received as much of the proceeds as possible.

If the above facts were the only ones presented at trial, our analysis would end here. However, by directing the premium notices to his address, Mr. Witherspoon interjected himself and assumed a duty to forward the premium notices onto the

appellees, as owners of the policy. This is a very specific and narrow concept that the jury should have been apprised of. Thus, while we determine that a recitation of the outdated civil pattern jury instructions was unwarranted, the circuit court erred by declining to define Mr. Witherspoon (and, by extension, UBS') duty, as it was required to do. There was evidence presented that Mr. Witherspoon owed a duty to appellees, but the circuit court's instructions failed to accurately explain the scope of that duty to the jury. Accordingly, appellants are entitled to a new trial on appellees' claim for negligent supervision regarding UBS, as well as appellees' claims for negligence, negligent misrepresentation, and deceit against Mr. Witherspoon.

## V.

### Damages

For the purposes of clarity, we will also address pertinent issues concerning the jury award. As explained *infra*, the jury award did not reflect the accurate measure of damages and should have been corrected by the circuit court.

Appellees were awarded both compensatory and punitive damages. Those awards are fundamentally different in nature. While "[t]he award of compensatory damages is an attempt to make the plaintiff whole again by monetary compensation[,]" punitive damages "punish the wrongdoer for misconduct and . . . deter future egregious conduct by others." *Exxon Corp. v. Yarema*, 69 Md. App. 124, 137 (1986) (citing *Cheek v. J.B.G. Properties, Inc.*, 28 Md. App. 29, 43-44 (1975)). "Ordinarily . . . damages for economic loss are not available in a tort action and are recoverable, if at all, in contract causes of

33

action and, in the case of fraud, in actions for deceit." *Lloyd*, 397 Md. at 123 (citing *U.S. Gypsum Co. v. Mayor and City Council of Baltimore,* 336 Md. 145, 156 (1994)).

This general rule does not apply in tort cases involving fraudulent or negligent misrepresentation. The Court of Appeals has cited four "rules" for damages in these cases:

(1)     If the defrauded party is content with the recovery of only the amount that he actually lost, his damages will be measured under that rule;

(2)     If the fraudulent representation also amounted to a warranty, recovery may be had for loss of the bargain because a fraud accompanied by a broken promise should cost the wrongdoer as much as the latter alone;

(3)     where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and

(4)     where . . . the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed.

*Hinkle v. Rockville Motor Co.*, 262 Md. 502, 511-12 (1971) (citing *Selman v. Shirley*, 161 Or. 582, 609 (1938)). These four "rules" form the basis of the "flexibility theory" of damages in fraudulent or negligent misrepresentation, where the victim of those torts "may elect to recover either 'out-of-pocket' expenses or 'benefit-of-the-bargain damages.'" *Goldstein v. Miles*, 159 Md. App. 403, 422 (2004). An enforceable bargain is a necessary prerequisite to recovering benefit-of-the-bargain damages. *Id*. at 428. A bargain "is '[a]n agreement between parties for the exchange of promises or

34

performances.'" *Id.* (quoting Black's Law Dictionary 143 (7th ed. 1999)) (modification in original). It is "narrower in scope than an agreement but broader in scope than a contract." *Id.* at 427. "A 'legal' promise has been defined as '[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made.'" *Id.* at 430 (quoting Black's, *supra*, at 1228).

*Goldstein*, 159 Md. App. at 403, is a useful illustration of this concept. In *Goldstein*, attorneys Scott B. Goldstein ("Mr. Goldstein") and James K. MacAlister ("Mr. MacAlister" and, collectively with Mr. Goldstein, the "former associates") sued their former employer, Stephen L. Miles ("firm owner"). Mr. Goldstein alleged that the firm owner expressed interest in selling the firm to Mr. Goldstein from the beginning of his employment. *Id.* at 411. The firm owner also persuaded Mr. MacAlister not to take another job offer by stating that he would sell his practice to Mr. MacAlister, Mr. Goldstein, and another associate upon the firm owner's retirement. *Id.* at 415-16. The former associates produced written communications where the firm owner indicated that he expected them to purchase the firm. *Id.* at 417. In subsequent years, the firm owner engaged in negotiations, including price terms, with Mr. Goldstein and another attorney. *Id.* at 417-19. Mr. MacAlister was not aware that these negotiations were taking place. *Id.* at 418-19. In turn, Mr. Goldstein was unaware that the firm owner was negotiating with the law firm of Saiontz & Kirk, which eventually bought the firm in question. *Id.* at 419.

The former associates subsequently filed suit, alleging fraud and negligent misrepresentation. *Id*. at 409. They claimed damages based on expert testimony that they would have earned $9,510,068 from purchasing the firm. *Id*. at 420. They also requested the difference between the value of the firm at the time of the sale and the reduced price promised to them by the firm owner. *Id*. The firm owner moved for summary judgment, which was granted by the circuit court on the basis that the firm owner and former associates never "struck a 'bargain'" for the firm's purchase. *Id*. at 409. The former associates thereafter appealed to this Court. *Id*.

On review of the circuit court's grant of summary judgment, we determined that there was no enforceable bargain between the firm owner and the former associates:

> [The firm owner]'s statements that he would sell [the former associates] his firm for a price below market value, upon his retirement, were not enforceable promises. These assertions did not contain any material terms of the sale such as purchase price, date of sale, interest rate, or terms of payment. Without these terms, it is impossible to determine what "the nature and extent of the parties' obligations" were, if any.

> Because of the vague and indefinite nature of [the firm owner]'s assertions, [the former associates] could not have reasonably relied on them. Rather, [the firm owner]'s assertions amount to no more than statements of intention because they were not "communicated in such a way that the addressee of the expression [could] justly expect performance and . . . reasonably rely thereon."

*Id*. at 431-32 (citations omitted). We therefore affirmed the judgment of the circuit court. *Id*. at 438.

One of the first cases in Maryland examining the tort of negligent misrepresentation, *Ward Development Co., Inc. v. Ingrao*, 63 Md. App. 645 (1985), is

also instructive. There, several homeowners sued the developer of their subdivision, Ward Development Co., Inc. ("Ward"), along with the relevant real estate firm and selling agent. *Id*. at 649. The homeowners alleged that they were told that the subdivision, along with a road running through it, would remain a certain size. *Id*. at 650. They were also provided an estimated sewer and water connection charge in their contracts. *Id*. at 651. However, after the homeowners purchased their residences, the subdivision was developed past the point that they were promised. *Id*. at 650. Furthermore, the actual utilities charges were significantly larger than the estimates provided. *Id*. at 651. Following a trial, a jury found Ward liable for negligent misrepresentation as to (1) the extension of a road in the subdivision and (2) the amount of the sewer and water charges. *Id*. at 652. Ward appealed to this Court, asserting first that the water and sewage estimates were not a viable "misrepresentation" to support the homeowners' negligent misrepresentation claim. *Id*. at 654. We determined that the circuit court did not err in denying Ward's motion for a directed verdict on that issue for the following reasons:

> Ward, as the developer of the subdivision . . . held [itself] out as knowledgeable in matters such as the charge for a sewer and water connection. The homeowners were entitled to rely on that estimate to a reasonable extent. But the charge stated in the contract was so far removed from the actual charge it cannot properly be termed a reasonable estimate and can only be explained as a misrepresentation. Therefore, we hold that the estimate of the sewer and water connection charge was actionable under a theory of negligent misrepresentation.

*Id*. at 656.

Ward also challenged the circuit court's denial of its motion for a new trial on the subject of damages. *Id*. at 657. We held that the flexibility theory applied to negligent misrepresentation as well as fraudulent misrepresentation. *Id*. at 659. We therefore concluded that the jury's verdict was "insupportable under any theory of damages[ ]":

> The jury apparently chose to award the homeowners the present value of their actual house connection charge and front foot benefit assessment. This result is contrary to Maryland law and the facts of this case. We note that the trial court's jury instructions regarding damages failed to state that the jury must subtract the amount stated as the sewer and/or water connection charge in each homeowner's contract from the actual charge, to arrive at the proper measure of damages.

*Id*. at 660 (citations omitted). The case was remanded for a new trial on damages. *Id*. at 663.

Our courts have a long history of upholding jury verdicts that are based on record evidence. *See Southern Mgmt. Corp. v. Mariner*, 144 Md. App. 188, 197 (2002) ("We will not question the jury's determination where there is ample evidence in the record to support the award[ ]"); *Butkiewicz v. State*, 127 Md. App. 412, 425 (1999); *Kirkpatrick v. Zimmerman*, 257 Md. 215, 218 (1970). However, the law of recovery for economic damages stemming from negligence and intentional tort claims indicates that damages in those cases must be measured in a specific way. Appellees' theory of recovery relies on their assertion that they would have paid the premiums if they had known what Mr. Witherspoon was concealing. Thus, any recovery should have been reduced by the present value of the premium payments, and the jury should have been instructed accordingly. In other words, appellees were entitled to only what they would have

38

received had Mr. Witherspoon timely forwarded each premium notice and had appellees, *and their siblings*, made those payments. Furthermore, appellees were only entitled to a *pro rata* share of the proceeds of the policy, minus the present value of the premiums. The jury's award did not reflect these principles. The value of appellees' damages may be established by expert testimony, and those experts may differ in their calculations. However, the award appellees received ignored the adjustment necessary to give appellees the benefit of their bargain. It should have been corrected by the circuit court.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY ARE REVERSED. CASE REMANDED FOR A NEW TRIAL ON THE CLAIMS OF NEGLIGENCE, NEGLIGENT SUPERVISION, NEGLIGENT MISREPRESENTATION, AND DECEIT CLAIMS ONLY. COSTS TO BE PAID BY APPELLEES.**